UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

SHEDRICK J. BRUMFIELD                        CIVIL ACTION NO. 16-cv-1197

VERSUS                                        JUDGE FOOTE

JERRY GOODWIN, ET AL                          MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Cedric J. Brumfield ("Plaintiff") is a convicted prisoner who has accumulated three strikes by filing frivolous IFP complaints. He is, therefore, barred from filing a civil action or appeal as a pauper unless he is under imminent danger of serious physical injury at the time he files the complaint or appeal. 28 U.S.C. § 1915(g); Banos v O'Guin, 144 F.3d 883 (5th Cir. 1998).

Plaintiff asked to file this complaint as a pauper against several officials at the David Wade Correctional Center ("DWCC"). The court reviewed the complaint and determined that the only claim that met the imminent danger exception was a claim for exposure to excessive heat directed at Secretary James LeBlanc, Warden Jerry Goodwin, Deputy Warden Angie Huff, and Colonel Lonnie Nail. Doc. 8. The claims against the other defendants were dismissed. Doc. 16. The four defendants who were required to answer the heat exposure claim have filed a Motion for Summary Judgment (Doc. 34, supplemented at Doc. 41). Plaintiff has filed a Memorandum in Opposition (Doc. 45). For

the reasons that follow, it is recommended that Defendants' motion be granted in part by dismissing the claims against Secretary LeBlanc and be denied with respect to the other three defendants.

**Injunctive and Declaratory Relief Claims are Moot**

Plaintiff was housed at DWCC in north Louisiana at the time he filed this complaint, and all of his allegations regard alleged heat exposure while held on extended lockdown at that prison between 2014 and 2016. He seeks injunctive and declaratory relief against DWCC officials, as well as compensatory and punitive damages. Soon after briefing on the pending motion was completed, Plaintiff notified the court that he is now housed at the Louisiana State Penitentiary in Angola, more than 200 miles from DWCC. Doc. 46.

A prisoner's transfer to another facility "render[s] his claims for declaratory and injunctive relief moot." Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001) (claims for injunctive and declaratory relief based on exposure to asbestos mooted by transfer); Cooper v. Sheriff, Lubbock County, 929 F.2d 1078, 1084 (5th Cir. 1991) (claims for injunctive relief based on denial of food at prior jail were moot). There is no information in the record to suggest that Plaintiff might be returned to DWCC in the foreseeable future, so any request for injunctive relief based on that possibility "is too speculative to warrant relief." Herman, 238 F.3d at 665. Accordingly, the only issues that remain are whether Plaintiff's heat-exposure claims for compensatory and punitive damages survive the summary judgment challenges raised by the defendants.

**Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A fact is "material" if it might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. Anderson, supra; Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986). If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine dispute of a material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S.Ct. 1348, 1355-56 (1986).

**Plaintiff's Allegations**

Plaintiff alleged in his complaint that he was 36 and had been on extended lockdown at DWCC for all or most of the prior two years. He complained that he suffers from hypertension, depression, bipolar disorder, and schizophrenia, which require him to take a variety of medications that make him susceptible to heat-related illnesses. An exhibit to his complaint indicates that a physician granted him a heat-related duty status with a notation: "Heat alert Precautions when indoor temp is greater than 90 degrees, NSAA."

Plaintiff alleged that the temperatures in his lockdown cellblock in the summer were extremely hot, and they adversely affected his blood pressure and other health matters. He complained that the single fan on the tier was inadequate to cool the area, he was not allowed to have a cup or afforded ice (because of his lockdown status), the water from his sink was lukewarm, and his shower water was hot. Plaintiff alleged that he sent letters and grievances to Defendants about these conditions, but they afforded no relief.

**Defendants' Summary Judgment Evidence**

Defendants attacked the complaint with affidavits from Dr. Pam Hearn and Colonel Lonnie Nail. Dr. Hearn has been the Medical Director at DWCC for approximately 30 years. She explains that during the summer months of 2014-2016, the standard of care for heat pathology at the prison was governed by the DOC's Health Care Policy No. 45 and DWCC Employee Policy Memorandum #04-01-039.

Those policies state that offenders prescribed psychotropic medication will be educated, monitored, and evaluated for potential adverse reactions concerning heat-related pathology. Education includes instruction that the prisoner increase his consumption of liquids and avoid the sun. The offender is generally to be brought indoors when outside temperature reaches or exceeds 90 degrees. Between May 15 and October 15, the staff is provided a list of all offenders with heat-related duty status, temperatures inside and outside each housing unit are monitored and recorded every two hours between 10:00 a.m. and 6:00 p.m., and a heat alert will issue if the indoor temperature reaches or exceeds 90 degrees. A heat alert means that offenders with a heat-related duty status are provided increased fluids and ice, allowed additional showers or issued cold wet towels, and

ventilation is increased to the area as much as possible. Offenders with signs of heat-related pathology will be immediately referred to the medical department for evaluation and treatment.

Dr. Hearn testifies that Plaintiff was taking a psychotropic medication during the relevant time, but he was never denied access to the medical department for complaints of heat-related illness. He was, as demonstrated by his medical records, treated for a number of complaints during the summer months of 2014 through 2016. The complaints ranged from multiple allegations of sexual assault by staff members, a declaration of a hunger strike, multiple complaints of being poisoned or having metal placed in his food, toothache, jock itch, and a piece of flex pen that Plaintiff put in his urethra. Some of his complaints also related to the heat. Dr. Hearn summarized them as follows:

| | |
|---|---|
| 7/7/14 | Complaint of bloody nose, right arm and leg numb, can't sleep from the heat, dizziness and rapid heartbeat - Numbness resolves after moving around, no dizziness, blood pressure checked. |
| 7/26/14 | Complaint of seeing white spots, headache and dizzy with heat making it worse - No Acute Distress noted, states took meds this morning. |
| 9/5/14 | Complaint of headache and dizzy with heat making it worse, numbness in right leg - Inmate walked from bunk to cell door without using assistance, Inmate standing freely no loose [sic] of balance noted, skin warm to touch, good skin tugor [sic] orthostatics; blood pressure and pulse rate checked while lying, sitting and standing; Inmate encouraged to stay hydrated and if symptoms worsen, notify medical. |
| 7/20/15 | Complaint of hot in cell, head spinning, seeing spots - Inmate taking [sic] to other inmates when nurse arrived, no signs of acute distress noted, Inmate instructed to drink plenty of fluids and to get a wet towel to wipe off with. |

| | |
|---|---|
| 8/4/15 | Complaint of dizziness, headache and tingling from head to feet - Vital signs taken and within normal limits, respiration even and unlabored, no signs of acute distress noted. |
| 6/26/16 | Complaint of being too hot - BP (Blood Pressure) 145/104, elevated noted, BP check ordered three (3) times a week for two (2) weeks. |
| 7/4/16 | Complaint of shortness of breath, head spinning, seeing white spots - No acute distress noted, No Shortness of Breath or distress noted, increase fluids during times of extreme heat. |
| 9/1/16 | Complaint of dizziness, rapid heartbeat, pain in right eye, started after 2:00 p.m. when it got hot in cell - No acute distress noted, Ambulatory without difficulty, Tylenol 325mg 4 tabs at 2 doses every 6 hours, Increase fluids. |

Dr. Hearn testifies that there is nothing in Plaintiff's medical records during the relevant times that indicate he suffered any heat induced syndromes such as heat stroke, muscle cramps, or heat exhaustion. She adds that there is nothing that indicates his health was adversely affected by being housed in the cellblock, and the records do not indicate that DWCC medical personnel failed to provide him with appropriate medical treatment. She concludes: "It is my opinion that based on the standard of care for Heath Pathology and medical records attached, offender Shedrick J. Brumfield's health was at no time adversely affected by being housed in a cellblock Housing Unit at DWCC."

Colonel Lonnie Nail offers similar testimony about the heat-related policies at the prison. He testifies that at no time during the summer months of 2014 through 2016 did he refuse to comply with the standard of care for heat-related illnesses as outlined in those policies. He also denies that he denied Plaintiff access to the medical department for evaluation and treatment of complaints of heat-related illness.

Colonel Nail acknowledges that he helped prepare a response to a grievance that Plaintiff filed about the heat. That response stated that industrial size fans, about three feet in diameter, were positioned on each tier in the cellblock housing units to assist air circulation in support of the exhaust fans located in the roof. Those fans help circulate air from the windows through vents above each bunk. Nail stated that prisoners on extended lockdown (such as Plaintiff) were not allowed to have cups or containers in their cell per policy, which is based on the potential for them throwing substances such as urine or feces. The prisoners do have unlimited access to fresh water in the sinks of their cells. Cups of iced beverages are distributed at each meal. Nail said that his investigation into the grievance revealed that Plaintiff's medical conditions were treated by the medical department, and there was no indication that Plaintiff's health had been adversely affected by being housed in the cellblock. Nail denies that he denied access to fresh water, increased fluids and ice, additional showers, or cold wet towels when the temperature exceeded 90 degrees. Nail does not, however, say that he provided such matters or that they were available. He merely states that he did not deny access to those amenities.

**Plaintiff's Summary Judgment Evidence**

Plaintiff states in a declaration made pursuant to 28 U.S.C. § 1746 that records show temperatures ranged from 90 to 94 degrees between June and August, sometimes exceeding 100 degrees. He states that he wrote letters to Warden Goodwin, Deputy Warden Huff, and Colonel Nail, which show that they were aware of the danger he faced. He does not, however, offer any specific testimony about any particular health problems that he

Page 7 of 15

suffered. He simply complains that it was hot, he risked health problems, and Defendants were aware of his situation.

The letters referred to by Plaintiff were also attached to his memorandum. Plaintiff recounts in the letters that he has made sick call requests because he was dizzy or lightheaded because of the heat, but officials keep ignoring his letters. He explained to Colonel Nail in one letter that the doctor had advised him to place a cold towel on his head and take cold showers, but he was allowed only one shower, the temperature of his shower water was 110 to 120 degrees, and he was not allowed ice or ice water. He made similar complaints to Warden Goodwin and Deputy Warden Huff, and he asked that they please provide access to fans, ice, cold showers, or other relief on his tier.

**The Eighth Amendment**

Plaintiff alleges that Defendants' actions and inactions in the face of extremely hot temperatures violated his Eighth Amendment right to be housed in humane conditions of confinement. The Constitution does not mandate comfortable prisons, but it does not permit inhumane ones. Farmer v. Brennan, 114 S.Ct. 1970, 1976 (1994). The Eighth Amendment requires that prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and they must take reasonable measures to ensure the safety of inmates. Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004).

A prisoner must meet two requirements to establish an Eighth Amendment violation. First, his deprivation must be, objectively, sufficiently serious. Farmer, 114 S.Ct. at 1977. The prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. Id. The inmate must show that he is incarcerated

"under conditions posing a substantial risk of serious harm." Farmer, 114 S.Ct. at 1977, citing Helling v. McKinney, 113 S.Ct. 2475, 2481 (1993).

The second requirement is that the prison official must have a sufficiently culpable state of mind. In prison conditions cases, that state of mind is one of deliberate indifference to inmate health or safety. Wilson v. Seiter, 111 S.Ct. 2321, 2326 (1991). A prison official acts with deliberate indifference if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Farmer, 114 S.Ct. at 1984.

**Qualified Immunity**

In addition to the direct challenge to the merits of Plaintiff's Eighth Amendment claim, each Defendant asserts qualified immunity as a defense. When resolving qualified immunity on summary judgment, courts determine (1) whether the facts, taken in the light most favorable to the party asserting the injury, show the officer violated a federal right and (2) whether the right was "clearly established" when the violation occurred. Tolan v. Cotton, 134 S.Ct. 1861, 1865–66 (2014); Winfrey v. Rogers, __ F.3d __, 2018 WL 707412, *5 (5th Cir. 2018).

"It is well established in this Circuit that exposure to extremely hot temperatures presents a substantial risk of serious harm to inmate safety." Webb v. Livingston, 618 Fed. App'x 201, 207 (5th Cir. 2015). And that right was clearly established several years before the events in this case. Id. at 209; Gates, 376 F.3d at 339 (exposure to hot temperatures was a substantial risk of serious harm to inmates); and Smith v. Sullivan, 553 F.2d 373, 381

(5th Cir.1977) ("[i]f the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health[,] relief should be granted").

Each defendant's entitlement to immunity must be examined separately. Meadours v. Ermel, 483 F.3d 417, 421-22 (5th Cir. 2007). Given the clarity of the applicable law, if the summary judgment record permits a finding that a defendant violated the Eighth Amendment standards, that defendant would not be entitled to qualified immunity. The resolution of each defendant's summary judgment request depends on whether there are genuinely disputed facts that, if resolved in favor of Plaintiff, would establish an Eighth Amendment claim against that defendant for excessive heat exposure.

**Analysis**

    **A. DWCC Officials**

The first Eighth Amendment requirement—that the deprivation be sufficiently serious—is satisfied. As noted above, it is well established that exposure to extremely hot temperatures presents substantial risk of serious harm to inmate safety. There have been a number of decisions in recent years that have found a prisoner to state a claim or to have prevailed after trial when substantially similar claims were asserted. Many of the prisoners who asserted the claims, some of whom allegedly died from heat exposure, suffered from hypertension, diabetes, depression or other condition that made them particularly vulnerable to heat stroke. Many of them also were required to take psychotropic or other medications that interfered with their bodies' ability to regulate temperature. See, e.g., Webb v. Livingston, 618 Fed. App'x. 201 (2015) (five prisoners died), Hinojosa v. Livingston, 807 F.3d 657 (5th Cir. 2015) (prisoner died), and Ball v. LeBlanc, 792 F.3d

584 (5th Cir. 2015) (Angola death row inmates). Plaintiff is in the same boat with regard to his medical conditions and medications that make him more susceptible to heat-related health problems, and he has presented evidence of extremely hot temperatures in his living area without readily available means to cool himself.

The next issue is whether Plaintiff has created a genuine dispute as to whether each defendant knew of, but was deliberately indifferent to, this known risk of harm. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Gates, 376 F.3d at 333; Webb v. Livingston, 618 Fed. App'x 201, 207 (5th Cir. 2015).

Plaintiff submits letters that he addressed to Warden Goodwin, Deputy Warden Huff, and Colonel Nail. Each letter complained about Plaintiff's health conditions, the heat exposure, and the lack of remedial measures available to him on lockdown. Plaintiff attaches a similar letter that he wrote to the prison chaplain, to which the chaplain responded that he made copies of Plaintiff's letter "and distributed them to the appropriate departments." Colonel Nail and Deputy Warden Huff were also directly involved in responding to the grievance filed by Plaintiff. The mere receipt of a grievance does not, alone, prove deliberate indifference, but can be circumstantial evidence that a prison official is aware of facts from which he can deduce a risk of harm. Ball, 792 F.3d at 595.

Plaintiff's version of the facts, which must be accepted for current purposes, is that he was not afforded the ice, cool showers, cold towels, or other remedial measures

described in the DOC and DWCC policies. Colonel Nail testifies that he did not deny such measures, but he does not state that they were ever made available. There is no other evidence in the record that Plaintiff was ever, even once, afforded those measures spelled out in the policies. The prisoners in the Ball case, who are on death row at Angola, had better ventilation than what Plaintiff describes. They had ice available in ice chests, but it sometimes ran out. They prevailed on the merits after trial. Plaintiff has presented evidence of facts that depict even more harsh conditions.

Dr. Hearn testified that it was her opinion that Plaintiff's health was not adversely affected by being in the cellblock. But the fact that Plaintiff may not have actually suffered a heat-related stroke or other incident does not defeat his claim. The Fifth Circuit stated in Ball "that no one at Angola, including these plaintiffs, has ever had a heat-related incident and that these prisoner's medical records do not show signs of heat-related illness are insufficient" to defeat the claims. Ball, 792 F.3d at 593. The inmates "need not show that death or serious injury has already occurred." Id. The inmate need only show that there is a substantial risk of serious harm. Id., citing Gates, 376 F.3d at 333.

Plaintiff's medical records show that he did complain of heat-related symptoms on several occasions. Medical staff generally found his vital signs to be within the normal range and did not offer any particular treatment, but they did direct that he drink plenty of fluids and use a wet towel for relief. Plaintiff has presented enough summary judgment evidence to create a genuine dispute as to whether he was at substantial risk of serious harm

and that prison officials at DWCC (Goodwin, Huff, and Nail) were aware of that risk and disregarded that risk by failing to take reasonable measures to abate it.[1]

### B. Secretary LeBlanc

The claim against Secretary LeBlanc is distinct. Supervisory officials are not liable for the actions of subordinates on a theory of vicarious liability or respondeat superior. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir.1987). A supervisor may be held liable under § 1983 only if either (1) he was personally involved in the constitutional deprivation, or (2) there existed a causal connection between the supervisor's wrongful conduct and the constitutional violation. Id. at 304.

LeBlanc challenges Plaintiff's ability to show his personal involvement, and Plaintiff has not presented evidence of letters or other facts that would show LeBlanc was personally aware of the danger Plaintiff faced. Plaintiff points to LeBlanc's knowledge of the Ball suit regarding Angola death row inmates, but LeBlanc's involvement in that suit

---

[1] "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." 42 USC § 1997e(e). The statute "applies to all federal civil actions in which a prisoner alleges a constitutional violation, making compensatory damages for mental or emotional injuries non-recoverable, absent physical injury." Geiger v. Jowers, 404 F.3d 371, 374-75 (5th Cir. 2005). A prisoner who makes out a claim, such as for violation of the First or Fourth Amendment that is not accompanied by a physical injury, may still recover nominal and punitive damages. Hutchins v. McDaniels, 512 F.3d 193, 197-98 (5th Cir. 2007). There may be a question as to whether Plaintiff can prove a physical injury within the meaning of the statute. If he cannot, then compensatory damages will not be available. Herman, 238 F.3d at 665 (denying recovery for allegedly deliberate asbestos exposure absent showing of physical injury). Scott v. Jackson, 2017 WL 3530146, *5 (E.D. Ark. 2017) (cold temperatures did not cause physical injury); and Taylor v. Stephens, 2016 WL 1068362, *4 (N.D. Tex. 2016) (allegations of exposure to heat did not allege physical injury).

does not make him personally aware of the risks faced by every prisoner throughout the state who faces heat-related conditions.

Plaintiff does point to his administrative grievance that was addressed by the Secretary at the final step. That second step response may be issued by the Secretary or his designee, and the one issued in this case states that a "qualified member of the Headquarters staff" reviewed the request and issued a response. That response deferred to the opinion of medical officials at DWCC and information provided by DWCC staff about alleged access to water, cups of iced beverages, etc.

The handling of a grievance can be circumstantial evidence that a prison official is aware of facts, but "it is not even particularly strong evidence of that" and "a prison administrator who has received an administrative remedy request is not necessarily made aware, without factual corroboration, that there is a substantial risk of serious harm." Ball, 792 F.3d at 595. The mere fact that Secretary LeBlanc's designee handled a grievance based on information provided by prison staff is not enough to create a genuine dispute of material fact with regard to LeBlanc's personal awareness of the risks faced by Plaintiff. He is entitled to summary judgment. Porter v. Epps, 659 F.3d 440, 448 (5th Cir. 2011) (Commissioner of DOC could not be deemed personally involved in a matter merely because a deputy commissioner signed his name to an order that denied an administrative appeal); Signorelli v. Stalder, 280 Fed. App'x 356 (5th Cir. 2008) (Secretary of DOC entitled to summary judgment absent evidence of personal involvement in inmate's medical treatment).

Accordingly,

**IT IS RECOMMENDED** that Defendants' **Motion for Summary Judgment (Doc. 34)** be **granted in part** by dismissing all claims against Secretary James LeBlanc and **denied in all other respects**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 20th day of February, 2018.



Mark L. Hornsby
U.S. Magistrate Judge